UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBIN A. FREUND,

                              Plaintiff,

            -v-

NANCY A. BERRYHILL, *Acting
Commissioner of Social Security*,

                              Defendant.

17-CV-9967 (JPO)

<u>OPINION AND ORDER</u>

---

J. PAUL OETKEN, District Judge:

Following the death of her husband in the September 11, 2001 attacks, Plaintiff Robin A.

Freund, who suffers from depression and post-traumatic stress disorder ("PTSD"), applied to the

Commissioner of Social Security (the "Commissioner") for disability insurance benefits and

disabled widow's insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 301 *et seq.*

The Commissioner denied Freund's application, and Freund now seeks judicial review. *See* 42

U.S.C. § 405(g). The Commissioner has filed the Certified Administrative Record (Dkt. Nos. 10

to 10-4 ("R.")), and Freund and the Commissioner have both moved for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. Nos. 11, 19.) For the reasons

that follow, the Commissioner's motion is granted, and Freund's motion is denied.

## I.        Background

The following background is drawn from the Certified Administrative Record.[1]

### A.        Personal Background

Robin Freund, who was born on September 14, 1955, has suffered from depression since

at least 1999. (R. 318.) Despite Freund's condition, she worked from 1995 to 2001 at a doctor's

---

[1] The Certified Administrative Record has been filed under seal at Docket Numbers 10 to
10-4. All citations in this opinion employ the consecutive pagination of the underlying record.

office, performing medical billing. (R. 202.) Thereafter, in September 2001, Freund began a new job as a school bus driver. (*Id.*) But her first day on the new job, September 11, 2001, was also her last. (R. 912–13.) On that day, Freund's husband, who worked as a firefighter for the New York City Fire Department ("FDNY"), was killed while performing rescue operations at the World Trade Center. (R. 432, 912–13.) This tragedy understandably exacerbated Freund's depression, and she has not worked since the day of her husband's death. (R. 201–02.)

Doctors' notes from the month following Freund's husband's death show Freund to have been feeling "very sad," suffering from insomnia (R. 432), and laboring under "a great deal of stress" (R. 429), albeit "coping fairly well" under the circumstances (R. 430). At that time, Freund was living with her three young children (R. 906), and Freund, in her own account, was focused on "keep[ing] her wheels going" for their sake because she "wanted their lives to stay as normal as possible" (R. 38). In December 2001, for example, Freund's son from a previous marriage drove her and the three children to Disney World as, in Freund's words, "a deterrent . . . just to keep [Freund and the children] from . . . dwelling" on the recent tragedy. (R. 910.)

Over the course of the next year, notes from Freund's treating physician, Dr. Robert C. Menezes, Jr., and from Project Liberty, a course of group and individual therapy run by FDNY's Counseling Services Unit, in which Freund participated from 2002 to 2008, reveal a hard-fought adjustment. (*See* R. 284–85, 522, 913–14.) Project Liberty intake notes from May 13, 2002, for example, indicate that Freund—"a very strong willed woman" who had been "making all sorts of investments and changes in her life" (R. 292)—had nevertheless been gaining weight and losing sleep since her husband's death (R. 291). Similarly, August 8, 2002 treatment notes from Dr. Menezes describe Freund as suffering from insomnia and "having a hard time dealing [with] her emotions" in the lead-up to the anniversary of her husband's death (R. 420), and Project Liberty

notes from September 8, 2002, likewise describe Freund as "really struggling" in the face of the anniversary (R. 308). Soon after the anniversary, the Project Liberty notes go on, Freund entered a "very angry phase," in which she "struggl[ed] [with] constant feelings of rage," although by November 25, 2002, Freund was "making steps to try to take care of herself," such as by exercising and getting a massage, despite "an increase in her depression." (R. 307.)

By early 2003, the Project Liberty notes reflect some improvement. For example, notes from January 8, 2003 describe Freund as "getting beyond some of the anger that was almost consuming her," even if there was "a lot still there," and by January 22, 2003, Freund "seem[ed] to be taking better care of herself," and was "really getting into horses [and] riding." (R. 305.) In February 2003, Freund was described as "really look[ing] terrific" and seeming to have "a little more peace" about her husband's death, despite "continu[ing] to be angry in other areas." (*Id.*) By springtime, Freund was "channeling a lot of her energy toward a new ball field in [her husband's] name," which seemed "helpful," and although Freund grew "very sad" in the lead-up to Easter, she was finding "ways to cope" and "getting strength." (R. 303.) And in April 2003, even though Freund was "exhausted [and] tired [and] feel[ing] depressed [and] overburdened" following a trip to Disney World, the Project Liberty notes indicate that she was "really getting into horseback riding [and] competing" and was being "helpful" to other widows. (R. 302.)

As is to be expected, of course, Freund's process was hardly linear. Toward fall of 2003, for example, Freund was thrown "into crisis" by the approach of the two-year anniversary of her husband's death and by the unexpected recovery of some of her husband's remains. (R. 300.) But soon after the anniversary, the Project Liberty notes describe Freund as "trying to help other widows" and as "getting beyond her own grief" by "trying to think about a future orientation [and] trying not to be so stuck in the past." (R. 299.) And while Freund continued to "seem[]

depressed" and to "get[] into conflict [with] people in her life," she "present[ed] . . . as very social and giving." (*Id.*) As 2003 drew to a close, though, Freund was still "experienc[ing] intense loneliness" (R. 298), and, during a consultation in which she was "crying at times" (R. 419), she "wonder[ed]" to Dr. Menezes whether she should be put on medication (R. 417).

These ups and downs continued into 2004. Early in the year, the Project Liberty notes describe Freund as "very lonely," despite "doing a lot of good things to move on" (R. 297),[2] while Dr. Menezes found that although Freund was "still grieving," a new course of medications had "[i]mproved" her depression (R. 413). That spring, the Project Liberty notes indicate that Freund went "through a sad period again" before "moving more into acceptance or resignation." (R. 297.) Despite some "malaise" in June of 2004, the Project Liberty notes report that Freund was "really getting into the horse riding," which was "quite therapeutic for her," and even as the three-year anniversary of her husband's death approached, Freund "seem[ed] to be doing better," notwithstanding her "[d]istress[]" and "lonel[iness]."[3] (R. 296.) Following the anniversary, Freund was "[s]till feeling bad [and] lonely," although she was "grateful for the support" she received in her group therapy sessions. (*Id.*) All the while, Dr. Menezes found Freund's depression to be "[i]mproved" (R. 412) and "[s]table" as a result of her medications (R. 409).

At some point in 2004, Freund decided to move her family into a new house, under the belief that "a fresh start would help." (R. 40; *see also* R. 926.) Thus, the Project Liberty notes from January 19, 2005, emphasize that, while "a little sad," Freund was "into new projects," such as "building a new house [and] barn to board horses," and was "[r]eally working to try to find

_____

[2] The relevant entry is dated January 14, 2003, but it is clear from the entry's placement within the Project Liberty log of progress notes that it should be dated January 14, 2004.

[3] Notes from Dr. Menezes also indicate that Freund had attended a horse show in the spring of 2004. (R. 411.)

herself" without her husband. (R. 295.) But Freund's new projects were not an unalloyed good. By mid-2006, Dr. Menezes noted that Freund's depression was "[w]orse" (R. 389), and toward the end of 2006, Freund indicated to Dr. Menezes that the process of moving, coupled with the responsibilities of caring for her children, was causing her "a lot [of] stress" (R. 385).

Freund's stresses continued into 2007, at which point Dr. Menezes ordered a change in Freund's medications, indicating that her control over her depression was "[s]ub-optimal." (R. 381.) On February 8, 2008, Dr. Menezes again characterized Freund as having "[s]ub-optimal control" over her depression (R. 367), due in part to the fact that Freund had stopped taking her medications (R. 365). As part of that same visit, though, Freund indicated that she was "ready to start" on her medications again because "some of her children [were] moving out and she recently broke up with someone." (R. 365.) Dr. Menezes therefore started Freund back on her medications (R. 367), and a few months later he remarked that Freund had "[i]mproved" (R. 360) and was "[d]oing better" (R. 359). By July 2009, Dr. Menezes believed that Freund's depression was "[s]table on [Freund's] current regimen" (R. 349), although notes from FDNY's Counseling Services Unit indicate that Freund continued to experience "family stress" at that time (R. 278).

Meanwhile, throughout the bulk of this period, Freund was participating in a study run by researchers at Columbia University's School of Social Work. (R. 187–95; *see also* R. 37.) The study, which analyzed a series of interviews held over a five-year span with family members of firefighters who had been killed in the September 11, 2001 attacks (R. 188–89), revealed that the grief experience of those who had lost loved ones in the attacks was "markedly different" from a typical process of bereavement (R. 189) because "the public and traumatic" nature of the events surrounding the attacks "delayed private mourning" (R. 192). But although the healing process was delayed, the Columbia researchers found that in the third year following the attacks, the

"constant retraumatisation and on-going reminders of the loss" began to wane and most study participants "were able to . . . get 'back on track'" and to "structure a more fulfilling life." (R. 194.) That said, a "subset" of participants, most of whom suffered from "[p]re-existing stresses and conditions," continued to struggle even past the three-year anniversary of the attacks. (*Id.*)

### B.    Administrative Proceedings

The ongoing anguish Freund has experienced since September 11, 2001, has prompted her to seek federal disability benefits. The instant case arises out of Freund's second attempt to do so. The Court first briefly describes Freund's initial benefits application before moving on to the twists and turns of the benefits application that forms the basis for the present litigation.

### 1.    The Prior 2010 Benefits Application

In the spring of 2010, Freund first applied for disability insurance benefits and disabled widow's insurance benefits under the Social Security Act, claiming that depression, PTSD, and other ailments had left her unable to work since September 11, 2001. (R. 228, 971–73.)

In connection with Freund's 2010 application, the Commissioner had Freund undergo a May 10, 2010 psychiatric evaluation from Dr. Leslie Helprin. (R. 521–26; *see also* Dkt. No. 12 at 12.) During that evaluation, Freund explained that she suffered from insomnia, "crying spells, loss of usual interests," feelings of loneliness and fear, and an inability to finish tasks. (R. 523.) Dr. Helprin found Freund "[c]oherent and goal directed" but observed that Freund became tearful and "dysphoric," *i.e.*, uneasy, as the evaluation went on. (R. 524.) Ultimately, though, Dr. Helprin found that Freund could "follow and understand simple directions and instructions[,] perform simple rote tasks and several complex tasks independently, maintain attention and concentration, . . . [and] relate adequately with others." (R. 525.) Thus, while Dr. Helprin found Freund's manner to be "consistent with psychiatric problems," these problems did not "appear to be significant enough to interfere with [Freund's] ability to function on a daily basis." (*Id.*)

Thereafter, the medical consultant assigned to Freund's case, Dr. V. Reddy, reviewed Freund's records, including Dr. Helprin's report. (R. 533–51.) In a May 18, 2010 assessment, Dr. Reddy concluded that Dr. Helprin's report was "consistent with the medical evidence" then on record (R. 549) and that Freund, despite moderate limitations in her ability to understand, remember, and carry out detailed instructions (R. 547), was capable of performing "simple, entry level work" (R. 550). The day after Dr. Reddy issued his assessment, the Commissioner denied Freund's benefits application. (R. 228, 972.) Freund never appealed this denial. (R. 228.)

## 2. The Present 2013 Benefits Application

Following "further deteriorat[ion]" of her "mental health and financial condition" in the years that followed the denial of her 2010 benefits application (R. 228), Freund submitted a new application, dated April 2, 2013, for disability insurance benefits and disabled widow's benefits (R. 59–60). In connection with this application, Freund provided the Commissioner with Project Liberty notes that had not been part of the record for her prior application (R. 73),[4] and she also submitted a February 28, 2013 statement from Dr. Menezes, indicating as relevant that Freund's mental health issues left her unable to travel alone or take public transportation (R. 557).

The Commissioner also received materials from two doctors who had begun seeing Freund only after Freund's prior benefits application had been denied. First, Dr. Manouchehr Lavian, who started treating Freund on April 22, 2011 (R. 650), completed a March 6, 2013 evaluation, in which he indicated that Freund had marked limitations in social functioning and concentration (R. 655) and that Freund could not adequately work with others without distraction (R. 653). In Dr. Lavian's view, Freund's limitations left her "complete[ly] [unable] to function

---

[4] The Commissioner determined that, due to the submission of the Project Liberty notes, Freund's 2013 application was not barred by res judicata. (R. 73.)

independently outside the area of [her] home" (R. 655) and would result in her being absent from work four or more days out of every month (R. 656). This conclusion was consistent with an earlier, August 24, 2012 letter, in which Dr. Lavian indicated that Freund had "great difficulty getting out of the house" and was "unable to concentrate" or "carry any jobs." (R. 650.)

Second, Dr. Laura Price-Kennedy, who had begun seeing Freund on September 5, 2013, submitted a May 29, 2014 letter, indicating that Freund suffered from "pervasive grief and sadness" and was "easily flooded and panicked by her emotions of hopelessness, sadness, fear and anger." (R. 646.) As a consequence, Dr. Price-Kennedy believed that it was "difficult for [Freund] to function socially and vocationally," particularly given that daily activities could be "overwhelming" for Freund and that Freund was "fearful of public space." (*Id.*) Due to "the severity of [Freund's] . . . symptoms of depression and trauma," Dr. Price-Kennedy found it "unlikely that Ms. Freund could sustain gainful employment" at the time of the letter.[5] (R. 647.)

On August 20, 2014, the Commissioner issued an initial denial of benefits (R. 80–97), on the ground that Freund had produced "insufficient evidence to assess [her] impairments" for purposes of establishing eligibility for the sought-after benefits. (R. 65, 73.) Dissatisfied with this outcome, Freund requested a hearing before an Administrative Law Judge ("ALJ"). (R. 98.)

In advance of the requested hearing (R. 114), Dr. Price-Kennedy submitted an additional letter and evaluation (R. 804–13). These materials characterized Freund as having a "constricted view of life" and a "depressed mind," being "quite isolated[] [and] fearfully prone to episodes of anxiety [and] panic" (R. 806), being "easily triggered into sadness/tears [and] anger," and being

---

[5] Treatment notes from Dr. Menezes corroborate that Freund was experiencing a period of emotional hardship around the time of her 2013 benefits application. For example, on July 31, 2013, Dr. Menezes reported that Freund was feeling "down, depressed, or hopeless . . . nearly every day." (R. 603.) And by the beginning of 2014, Dr. Menezes noted, Freund was "[p]retty much staying home alone" (R. 597), with her depression and insomnia worsening (R. 600, 726).

"unable to cope with or maintain social interaction except briefly" (R. 808). Consequently, Dr. Price-Kennedy found that Freund was unable to function independently (R. 810), to "sustain the kind of focus [and] attention needed to perform complex tasks or on the job duties" (R. 808), or to "focus [and] attend or concentrate sufficiently to remember [and] carry out detailed instructions" (R. 809). Finally, Dr. Price-Kennedy opined, as Dr. Lavian had, that Freund's disability would require her to be absent from work at least four days per month. (R. 811.)

Thereafter, on May 7, 2015, the benefits hearing took place. (R. 28–58.) At the hearing, Freund testified that she had "a hard time just interacting with people" (R. 41) and that she would go to the supermarket "on off times" to avoid crowds (R. 44). Indeed, Freund reported staying at home five days a week (R. 45) and having no social interactions beyond those occasioned by her children's activities (R. 41). That said, Freund reported that she remained able to perform house and yard work (R. 41–43), care for animals (R.43), run errands (R. 45), and drive solo (R. 35).

On May 26, 2015, the ALJ who had presided at Freund's hearing concluded that Freund was not entitled to benefits. (R. 8–27.) Although finding that Freund suffered from "severe impairments," including depression and PTSD (R. 14), the ALJ found that the limitations imposed by these impairments would not have left Freund unable, during the relevant period, to perform certain jobs that "exist[ed] in significant numbers in the national economy" (R. 22).

Freund asked the Social Security Administration's Appeals Council (the "Appeals Council") to review the ALJ's decision (R. 7), and review was denied on May 26, 2015 (R. 1–6). Thereafter, Freund filed a complaint in federal court, seeking judicial review of the Commissioner's adverse determination. *See Freund v. Colvin*, No. 16 Civ. 217 (S.D.N.Y.). During the course of that litigation, however, the parties realized that the ALJ opinion that the Commissioner had adopted as the final decision in Freund's case (R.1) was based on hearing

testimony that had not been transcribed and that, as a result, did not form part of the administrative record (R. 969).  The Commissioner therefore stipulated that Freund's case should be remanded for further agency consideration.  (R. 966.)  On September 9, 2016, once the case had been remanded from federal court (R. 965), the Appeals Council vacated the May 26, 2015 ALJ opinion and called for a new hearing (R. 969).

Freund's second hearing before the ALJ took place on November 15, 2016.[6]  (R. 899–938.)  At this hearing, Freund testified that, between 2001 and 2008, she had been able to drive her children to activities, go grocery shopping (R. 905–07), plant flowers and vegetables (R. 909–10), and attend her children's sporting events and riding lessons, although she denied having gone horseback riding herself (R. 916–17).  At the same time, Freund maintained that her grief had been "very consuming" during that "very lonely" period (R. 924) and that she would often return to bed after sending her children off to school for the day (R. 923).  Freund also reported having "retreated from people" and "isolated [her]self" following her husband's death (R. 915) and further maintained that she experienced ongoing problems with focus, concentration, and sleep (R. 918–19).  Notwithstanding these difficulties, Freund confirmed that she had not begun psychiatric treatment until she began seeing Dr. Lavian in 2011.  (R. 914–15.)

Vocational expert Louis Szollosy also testified at the November 15, 2016 hearing.  (R. 927–33.)  According to Szollosy, a person of Freund's age, education, and work history who was capable of performing light work, with certain physical restrictions, but who was "able to understand, remember and carry out simple, routine repetitive work-related tasks" would not be capable of performing Freund's past work but could perform other, unskilled jobs in the national

---

[6] Prior to this hearing, Drs. Lavian and Price-Kennedy submitted updated assessments that largely mirrored their earlier determinations.  (R. 1181–88.)

economy.  (R. 928–29.)  Szollosy further testified that the same would hold true even if this person needed to "work in a low-stress job with only occasional decision-making" but could "adapt to occasional changes in the work place."  (R. 930.)  That said, Szollosy maintained that the person would not be employable if, in addition to the above limitations, the person were off-task for 10–15% of the workday or were regularly absent from work at least twice a month.  (R. 930–32.)

In a February 1, 2017 opinion, the ALJ once again denied Freund's benefits application.[7]  (R. 839–60.)  As an initial matter, the ALJ determined that, under the relevant law, Freund needed to establish that her disability began on or before December 31, 2006, to be eligible for disability insurance benefits and on or before September 30, 2008, to be eligible for disabled widow's insurance benefits.  (R. 840.)  The ALJ then went on to find that, during the relevant period, Freund had suffered from severe impairments that caused "more than minimal functional limitations" and that included, as relevant, depression and PTSD.[8]  (R. 842.)  But although the ALJ determined that Freund's impairments had placed mild limitations on Freund's ability to understand, remember, or apply information, interact with others, and adapt or manage herself, as well as moderate limitations on Freund's ability to concentrate, persist, or maintain pace, the ALJ determined that these limitations were insufficiently severe to establish, in and of themselves, that Freund had been disabled during the necessary period.  (R. 844–48.)

The ALJ therefore turned to the "more detailed assessment" of precisely how those limitations affected Freund's "mental residual functional capacity" (R. 848), defined as "the most

---

[7] This opinion was an amended version of an opinion initially issued on January 26, 2017.  (R. 870–90.)

[8] The ALJ also determined that Freund had been severely impaired as a result of obesity, certain spinal problems, and sleep apnea.  (R. 842.)  None of the ALJ's findings with respect to Freund's physical impairments, however, are presently at issue.  (*See* Dkt. No. 12 at 5.)

[Freund] c[ould] still do despite [her] limitations," 20 C.F.R. § 404.1545(a)(1).  Broadly, the ALJ

found that, during the relevant period, Freund had been capable of performing "light work," with

certain physical restrictions not at issue here, in "a low-stress job with only occasional decision-

making," even if that job required "adapt[ing] to occasional changes in the work place."  (R.

848.)  In reaching this conclusion, the ALJ accepted that Freund's "medically determinable

impairments could reasonably be expected to cause" the symptoms Freund alleged to have

experienced during the relevant period, but he found that Freund's "statements concerning the

intensity, persistence and limited effects of those symptoms [were] not entirely consistent with

the medical evidence and other evidence in the record."  (R. 850.)  Specifically, the ALJ

emphasized that, during the time period at issue, Freund had attended group therapy, had never

sought out or been referred to a psychiatrist, had gone to Disney World and gone horseback

riding, had overseen the construction of a new house and barn, and had received generally

unremarkable assessments from Dr. Menezes and the Project Liberty counselors.  (R. 850–52.)

In the ALJ's view, none of the medical opinions called for a contrary conclusion.  First,

the ALJ gave "significant weight" to Dr. Reddy's May 18, 2010 opinion that Freund was capable

of "simple, entry-level work" because the opinion was "generally consistent with the overall

evidence of record" and because it "offer[ed] a retrospective review of the evidence" and so

"encapsulate[d] the time period at issue."  (R. 852.)  Next, the ALJ afforded "limited persuasive

weight" to Dr. Price-Kennedy's opinions because those opinions were "not consistent with the

overall record" and did not purport to be "retrospective opinion[s] regarding [Freund's]

functioning during the relevant period at issue," which had ended almost five years before Dr.

Price-Kennedy began treating Freund.  (R. 853.)  Similarly, the ALJ assigned "limited persuasive

weight" to Dr. Lavian's opinions because these opinions did not offer a retrospective view of the

relevant period—which had ended almost three years prior to the time Dr. Lavian began to see Freund—and were, in any event, "inconsistent with the overall evidence of record" from that period.  (R. 854.)  Next, the ALJ gave "some weight" to Dr. Helprin's largely benign May 10, 2010 assessment because, despite postdating the relevant 2001–2008 period, the assessment was "generally consistent with [Freund's] relatively unremarkable course of treatment at Project Liberty and with . . . Dr. Menezes for the period at issue."  (R. 855.)  Finally, the ALJ determined that Dr. Menezes's February 28, 2013 opinion that Freund was limited in her ability to travel alone or take public transportation was entitled to "limited persuasive weight" because, among other things, it postdated the relevant period by more than four years and contained no indication that it was intended to apply to the period at issue.  (R. 856.)

Moreover, the ALJ found that Freund's own testimony did not undermine his conclusion as to her residual functional capacity because Freund's "allegations of debilitating symptoms" were "not wholly consistent with the objective evidence of record."  (R. 857.)  First, the ALJ found that Freund's activities during the relevant period, which included driving, caring for her children, running errands, tending a garden, overseeing construction of a house, riding horses, supporting other group therapy participants, and taking occasional trips, were "not limited to the extent that one would expect" had Freund's symptoms been fully disabling.  (R. 857.)  Next, the ALJ emphasized that Freund's treatment during the relevant period was "routine and/or conservative in nature" (*id.*) and did not involve referral to a psychiatrist (R. 858.)  Additionally, the ALJ noted that the record contained no "non-conclusory or time-relevant opinions . . . from treating or examining physicians indicating that [Freund] [had been] disabled during the period in question."  (*Id.*)  Finally, the ALJ pointed out that Freund had "worked only sporadically prior to the alleged disability onset date, which raise[d] a question as to whether [her] continuing

unemployment [was] actually due to her medical impairments," and that, at the November 15, 2016 hearing, Freund had "betrayed no evidence of debilitating symptoms" or of "any significantly limiting mental or emotional problem." (*Id.*)

Having thus assessed Freund's residual functional capacity, the ALJ concluded by considering whether, in light of Freund's limitations, Freund would have been able to work during the relevant period. Although finding that Freund's limitations would have prevented her from performing her past work as a medical biller (*id.*), the ALJ determined based on Szollosy's testimony that "there [were] jobs that exist[ed] in significant numbers in the national economy," such as office helper, router, or sorter, "that [Freund] [could have] perform[ed]" during the period in question despite her limitations (R. 859). As a result, the ALJ concluded, Freund had not been disabled within the meaning of the Social Security Act at the relevant time. (R. 860.)

Freund then sought review from the Appeals Council. (R. 1074–75.) In a November 3, 2017 opinion, the Appeals Council rejected each of Freund's specific exceptions to the ALJ's opinion and finally brought the administrative proceedings to a close by adopting the ALJ's opinion as the Commissioner's final decision. (R. 814–18.)

### C.       The Instant Suit

Dissatisfied with the outcome of the administrative proceedings, Freund filed a complaint against the Commissioner in this Court on December 19, 2017, seeking judicial review of the benefits denial.[9] (Dkt. No. 2.) The Commissioner filed the Certified Administrative Record on March 22, 2018 (Dkt. No. 10 to 10-4), and Freund moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on April 4, 2018 (Dkt. No. 11). The Commissioner filed a cross-motion for judgment on the pleadings on August 20, 2018 (Dkt. No.

---

[9] Freund initially proceeded *pro se*, but she has since retained counsel. (*See* Dkt. No. 9.)

19), and Freund then filed a reply to the cross-motion on August 28, 2018 (Dkt. No. 21).  The Court now turns to the merits of the parties' motions.

## II.     Legal Standard

In reviewing the Commissioner's final decision, "this Court is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)); *see also* 42 U.S.C. § 405(g) (providing that the Commissioner's findings of fact, "if supported by substantial evidence, shall be conclusive").  Under the "very deferential" substantial-evidence standard, this Court may reject the ALJ's view of the facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis omitted) (second quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

## III.    Discussion

Under the Social Security Act, a claimant is eligible for disability insurance benefits or disabled widow's insurance benefits only if she has a "disability."  42 U.S.C. §§ 402(e)(1)(B)(ii), 423(a)(1)(E).  Here, the parties agree that Freund is eligible for disability insurance benefits only if her disability began by December 31, 2006, and for disabled widow's insurance benefits only if her disability began by September 30, 2008.  (Dkt. No. 12 at 14; Dkt. No. 20 at 13.)

As relevant, the Social Security Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that has lasted for a year or more, 42 U.S.C. § 423(d)(1)(A), where that impairment is "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 423(d)(2)(A).  The Commissioner's

procedure for assessing disability places the burden on the claimant to show that an impairment leaves her unable to perform her past work. *See Gladden v. Comm'r of Soc. Sec.*, 337 F. App'x 136, 137 (2d Cir. 2009) (summary order). If the claimant successfully carries this burden, "the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004) (alteration in original) (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

Here, the ALJ concluded that Freund had successfully shown that, during the relevant period, her depression and PTSD, among other things, left her unable to return to her past work. (R. 858.) But the ALJ also found that Freund's residual functional capacity left her capable of performing certain "low-stress job[s]" that entailed "only occasional decision-making." (R. 848.) In light of that finding, the ALJ determined that Freund could have performed other work in the national economy during the relevant time and so had no qualifying disability. (R. 859.)

Freund now argues that the ALJ's analysis was fatally flawed and that this case must be remanded to the agency. (Dkt. No. 12 at 25–26.) In doing so, Freund challenges no one factual finding as unsupported by substantial evidence. (Dkt. No. 21 at 1.) Rather, she argues that the ALJ made four errors of law. (Dkt. No. 12 at 15–25.) First, she argues that the ALJ improperly assigned only limited weight to the opinions of her treating physicians. (Dkt. No. 12 at 15–16.) Second, she argues that the ALJ failed to properly develop the record as to her limitations during the 2001–2008 period at issue. (Dkt. No. 12 at 16–17.) Third, she argues that the ALJ failed to take account of her limitations in concentration, persistence, and pace, as well as evidence that she might miss work often. (Dkt. No. 12 at 17–23.) Finally, she argues that the ALJ improperly considered her ability to perform the basic tasks of everyday life. (Dkt. No. 12 at 23–25.)

The Court addresses each argument in turn.

## A.    Opinions of Treating Physicians

First, Freund argues that the ALJ erred by assigning only limited weight to the opinions of her treating physicians, Drs. Menezes, Lavian, and Price-Kennedy.  (Dkt. No. 12 at 15–16.) Typically, the Commissioner "give[s] more weight to medical opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)."[10]  20 C.F.R. § 404.1527(c)(2).  And although Drs. Lavian and Price-Kennedy were not treating Freund during the 2001–2008 period relevant to her claim, "the fact that a treating physician did not have that status at the time referenced in a retrospective opinion does not mean that the opinion should not be given some, or even significant weight." *Monette v. Astrue*, 269 F. App'x 109, 113 (2d Cir. 2008) (summary order).  Thus, Freund maintains, the ALJ's decision to discount her treating physicians' opinions—which Freund contends were retrospective in nature—was legal error.

The Court disagrees.  For one thing, the opinions of Freund's treating physicians contain no indication that they addressed Freund's condition during the 2001–2008 time period at issue. (R. 853–54, 856.)  In the case of Dr. Menezes, his February 28, 2013 opinion appeared on a form indicating that any listed impairments were "assumed" to concern "current limitations only."  (R. 557.)  Indeed, Dr. Menezes left blank the section of the form that invited him to indicate whether he had "sufficient information to form an opinion . . . as to [Freund's] past limitations."  (*Id.*)  As for Drs. Lavian and Price-Kennedy, even though their opinions at times contain backwards-facing language—noting, for example, that Freund "has a history of depression," "developed [PTSD] after . . . September 11, 2001," "remains" depressed (R. 650), and suffers from an

---

[10] Freund makes no argument that the opinions of her treating sources were entitled to controlling weight.  (*See* Dkt. No. 12 at 15–16.)

"ongoing sense of vulnerability and depression" (R. 804)—the doctors nowhere opine that the specific functional limitations identified in their opinions predate September 30, 2008.

Moreover, an ALJ need not afford even an explicitly retrospective opinion from a treating physician significant weight where "there is substantial evidence that the opinion is contradicted by other evidence." *Monette*, 269 F. App'x at 113; *see also Flanigan v. Colvin*, 21 F. Supp. 3d 285, 305–06 (S.D.N.Y. 2014) (citing cases). Here, the administrative record includes abundant treatment and therapy notes from the relevant 2001–2008 period, none of which indicate that Freund was at that time suffering the sort of pronounced debilities that Freund's treating physicians observed in 2011 and beyond. *See O'Connor v. Shalala*, No. 96-6215, 1997 WL 165381, at *1 (2d Cir. Mar. 31, 1997) (unpublished opinion) ("In determining the existence of a disability, the Commissioner is also entitled to rely on the absence of contemporaneous evidence of the disability."); *Johnston v. Colvin*, No. 13 Civ. 2710, 2015 WL 657774, at *5 n.3 (S.D.N.Y. Feb. 13, 2015) ("As the Second Circuit has noted, the absence of evidence from the claimed period of disability may itself be considered substantial evidence."). And Dr. Reddy's May 18, 2010 evaluation—based in part on Freund's May 10, 2010 in-person examination by Dr. Helprin—found that Freund had no significant limitations in most areas of functioning. (R. 547.)

Given that the opinions of Freund's treating physicians were not retrospective in any relevant respect and that the ALJ had substantial evidence for his view that those opinions were "inconsistent with the overall evidence of record" even if treated as retrospective (R. 853–54, 856), the ALJ committed no legal error in discounting the weight of those opinions.

## B. Duty to Develop the Record

Next, Freund claims that the ALJ committed legal error by "failing to take any steps to clarify [her] functional capacity during the period in question because of the limitations in the evidence." (Dkt. No. 12 at 16–17.) In particular, Freund emphasizes that none of the medical

opinions in the record were "explicitly retrospective," so as to cover the 2001–2008 period at issue.  (Dkt. No. 12 at 16.)  Thus, Freund argues, the ALJ should have reached out to Dr. Menezes to solicit a retrospective opinion, or at least sought testimony from a medical expert as to Freund's residual functional capacity during the relevant time.  (Dkt. No. 12 at 17.)

It is certainly true that "the ALJ generally has an affirmative obligation to develop the administrative record," given the non-adversarial nature of Social Security proceedings.  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  And the Commissioner's own regulations make clear that an ALJ "may need to take . . . additional actions," such as re-contacting a claimant's medical source, where the record evidence "is insufficient or inconsistent."  20 C.F.R. § 404.1520b(b). But "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Lowry v. Astrue*, 474 F. App'x 801, 804 (2d Cir. 2012) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

Here, Freund identifies no inconsistencies in the administrative record that would have required reconciliation.  For example, the fact that Freund's mental health conditions imposed certain limitations on her activities by the time Drs. Lavian and Price-Kennedy first observed her in 2011 and 2013, respectively, does not "conflict[] with other evidence," 20 C.F.R. § 404.1520b(b), that suggests those limitations were not yet present during the 2001–2008 period relevant here.  Nor does Freund identify any way in which the present record is incomplete.  To the contrary, she expressly concedes that "there are no additional records that could have or should have been obtained."  (Dkt. No. 12 at 16.)  Nonetheless, Freund maintains that the ALJ's obligation to develop the record was triggered by the absence of any medical opinion evidence "unambiguously referring to the [2001–2008] period in question."  (Dkt. No. 12 at 17.)

An ALJ may in some cases commit legal error by failing to request a retrospective assessment from a claimant's treating physician, or at least from a consultative physician. *See, e.g.*, *Rogers v. Astrue*, 895 F. Supp. 2d 541, 551–52 (S.D.N.Y. 2012). But the duty to make such a request arises only if the record evidence from the time period at issue "does not contain all the information [the Commissioner] need[s] to make [a] determination" on disability. 20 C.F.R. § 404.1520b(b); *compare, e.g.*, *Rogers*, 895 F. Supp. 2d at 551–52 (remanding for ALJ to solicit a retrospective diagnosis where there was "almost no medical evidence in the record from during the relevant time period," *id.* at 544), *with, e.g.*, *Perez*, 77 F.3d at 48 (concluding that ALJ had not erred by failing to request a retrospective assessment from claimant's treating physicians where "[t]he ALJ had before him a complete medical history" already).

Here, the ALJ had before him "[Freund's] complete medical history, testimony from the two [administrative] hearings, and the [consultative] evaluation" performed by Dr. Helprin, *Miller v. Barnhart*, 175 F. App'x 952, 957 (10th Cir. 2006), as well as non-retrospective evaluations from three treating physicians. These materials were sufficient for the ALJ to assess Freund's limitations during the relevant period. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order) (providing that "a medical source statement or formal medical opinion is not necessarily required" where other record evidence is sufficient to assess a claimant's residual functional capacity). Freund has not shown that retrospective assessments from her treating physicians—two of whom saw Freund for the first time years after the relevant period had ended—"would have revealed any useful information or that the physicians were prepared to undertake such assessments." *Perez*, 77 F.3d at 48. Indeed, Dr. Menezes—the only one of Freund's treating physicians who had contact with her during the period at issue—

declined, when asked, to represent that he had "sufficient information to form an opinion within a reasonable degree of medical probability as to [Freund's] past limitations." (R. 557.)

Given that the existing record was sufficient to assess Freund's residual functional capacity during the period at issue and, further, contained no unresolved contradictions, the ALJ did not err in failing to develop the record further.

## C.      Residual Functional Capacity

Freund next argues that the ALJ's findings as to her residual functional capacity during the 2001–2008 period at issue were flawed as a matter of law because they failed to take account of (1) the ALJ's own determination that Freund had suffered moderate limitations on her ability to concentrate, persist, or maintain pace during the relevant period (Dkt. No. 12 at 17–22) and (2) evidence that Freund's mental condition would cause her to miss work four or more times per month (Dkt. No. 12 at 22–23).

### 1.      Concentration, Persistence, and Pace

The Commissioner's regulations provide that a claimant might sometimes suffer from impairments of such a nature that the Commissioner may deem the claimant "disabled without considering [the claimant's] age, education, and work experience." 20 C.F.R. § 404.1520(d). In coming to the conclusion that Freund did not suffer from such a *per se* disabling impairment, the ALJ considered her ability to concentrate, persist, and maintain pace and concluded that she suffered moderate limitations in these areas. (R. 846.) Freund now argues that the ALJ erred by failing to explicitly include these limitations when he related Freund's residual functional capacity to the vocational expert and when he announced his ultimate findings regarding Freund's residual functional capacity. (Dkt. No. 12 at 17–22.)

The Second Circuit has held that an ALJ "should explicitly incorporate any limitations in concentration, persistence, and pace" when asking a vocational expert hypothetical questions that

are designed to reflect a claimant's residual functional capacity. *McIntyre v. Colvin*, 758 F.3d

146, 152 (2d Cir. 2014). When questioning Szollosy here, though, the ALJ made no reference to

any limitations in this area. Instead, the only non-exertional limitations the ALJ included in the

hypotheticals he posed to Szollosy involved an ability to "understand, remember and carry out

simple, routine repetitive work-related tasks" (R. 929), a need to "work in a low-stress job with

only occasional decision-making," and an ability to "adapt to occasional changes in the work

place" (R. 930).[11] As multiple courts have recognized, "an ALJ does not [necessarily] account

'for a claimant's limitations in concentration, persistence, and pace by restricting [a] hypothetical

question [posed to a vocational expert] to simple, routine tasks or unskilled work.'" *Mascio v.*

*Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d

1176, 1180 (11th Cir. 2011)); *see Winschel*, 631 F.3d at 1180 (citing cases from the Third,

Seventh, and Eighth Circuits).

　　　　An ALJ's failure, however, "to incorporate non-exertional limitations in a hypothetical

(that is otherwise supported by evidence in the record)" does not always require remand.

*McIntyre*, 758 F.3d at 152. After all, the Second Circuit has held that such a failure "is harmless

error if (1) 'medical evidence demonstrates that a claimant can engage in simple, routine tasks or

unskilled work despite limitations in concentration, persistence, and pace,' and the challenged

hypothetical is limited 'to include only unskilled work'; or (2) the hypothetical 'otherwise

---

[11] The ALJ and Freund's counsel also asked Szollosy about the employability of a person who "would be off task 15% of the workday." (R. 930–32.) But because Szollosy opined that such a person would not be employable in any job (R. 932) and because the ALJ determined that Freund was capable of working in the national economy despite her limitations (R. 859–60), that question could not have reflected the presumably milder degree of limitation in concentration, persistence, and pace that the ALJ ultimately found Freund to suffer from.

implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace." *Id.* (alteration in original) (quoting *Winschel*, 631 F.3d at 1180).

In this case, the Court need not determine whether the ALJ erred by failing to expressly include Freund's limitations in concentration, persistence, and pace in his residual functional capacity findings, or in the hypothetical questions he posed to Szollosy, because any error was harmless. In concluding that Freund had limitations in the relevant areas, the ALJ found that the medical evidence supported Freund's ability to "perform[] simple, routine, repetitive, non-complex . . . basic unskilled work tasks" notwithstanding these limitations. (R. 846.) Freund never argues that this finding was unsupported by substantial evidence, and indeed it finds direct support in Dr. Helprin's consultative assessment (*see* R. 525), which was also adopted by Dr. Reddy (R. 549–50). Therefore, given that the ALJ included a limitation to "simple work-related tasks" in Freund's residual functional capacity (R. 848)—and included the same limitation in the hypotheticals he posed to Szollosy when asking whether there was unskilled work Freund could perform (R. 929–30)—his failure to include an explicit additional limitation as to concentration, persistence, and pace was harmless error, if it was error at all. *See McIntyre*, 758 F.3d at 152; *see also Mascio*, 780 F.3d at 638 (noting that it may be "appropriate to exclude" a "concentration, persistence, or pace limitation" from a hypothetical where the ALJ has found that the limitation "does not affect [the claimant's] ability to work"); *Winschel*, 631 F.3d at 1180 ("[W]hen medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting [a] hypothetical to include only unskilled work sufficiently accounts for such limitations.").

## 2. Absence from Work

Freund also contends that the ALJ's residual functional capacity finding was flawed because it failed to incorporate Dr. Lavian and Price-Kennedy's opinions that Freund's mental conditions would cause her to miss work at least four times per month. (Dkt. No. 12 at 22–23; *see also* R. 656, 811.) As the Court has already explained, however, the ALJ acted within his discretion in assigning only limited weight to these opinions' retrospective assessments, if any, of Freund's functional limitations during the relevant period. *See supra* Section III.A.

Accordingly, the Court need ask only whether the ALJ's implicit finding that Freund was capable of appearing for work on a regular basis during the relevant period was supported by substantial evidence. As the ALJ noted (R. 857), the record contains evidence that Freund was able to attend her children's sporting events and riding lessons (R. 916–17), run errands (R. 45), go to horse shows (R. 411), and have family vacations (R. 302, 910). Nor do the treatment or counseling notes from the relevant period—or the medical assessments of Drs. Menezes, Helprin, or Reddy—contain any suggestion that Freund's impairments left her homebound on a regular basis. As a result, the Court cannot conclude that "a reasonable factfinder would *have to*" determine that Freund would have been regularly absent from work during the relevant 2001–2008 period. *Brault*, 683 F.3d at 448 (quoting *Warren*, 29 F.3d at 1290). The ALJ therefore was not required to include such a limitation in Freund's residual functional capacity.

## D. Consideration of Freund's Activities

Finally, Freund argues that the ALJ, when assessing her residual functional capacity, improperly took account of her ability to perform the basic tasks of everyday life. (Dkt. No. 12 at 23–25.) And insofar as the record reflected more sustained activity on Freund's part—such as horseback riding and oversight over the construction of a new house—Freund argues that the evidence was at best ambiguous as to her actual level of participation. (Dkt. No. 12 at 24–25.)

The Second Circuit has endorsed the conclusion that "'a claimant need not be an invalid to be found disabled' under the Social Security Act," *Balsamo*, 142 F.3d at 81 (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988)), and has rejected the Commissioner's efforts to treat a claimant's ability to perform daily tasks as substantial evidence sufficient to outweigh clinical findings suggestive of disability, *see id.* at 81–82.  But this is not to say that a claimant's daily activities cannot form part of a holistic calculus.  *See, e.g.*, *Ellington v. Astrue*, 641 F. Supp. 2d 322, 332 (S.D.N.Y. 2009) ("If a claimant performs housework on a daily basis, the ALJ can *consider* such work as evidence that the claimant is not disabled." (emphasis added)); 20 C.F.R. § 404.1529(c)(3)(i) (authorizing consideration of a claimant's "daily activities").  Indeed, the Second Circuit has approved an ALJ's consideration of "evidence that [a claimant] had the ability to cook and care for herself, operate a car, complete household chores, care for her son, and run errands" when assessing the credibility of the claimant's "statements regarding the intensity, persistence and limiting effects of [her] symptoms."  *Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011) (summary order).

In this case, the ALJ permissibly considered evidence of Freund's daily functioning. Rather than treating such evidence as a standalone basis for rejecting contrary medical opinions, the ALJ read this evidence together with Freund's treatment notes and Dr. Helprin's and Dr. Reddy's medical opinions—none of which noted marked limitations on Freund's functioning— to arrive at the supportable conclusion that Freund's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (R. 850.)  And while the ALJ did cite Freund's daily activities as one basis for finding the opinions of Drs. Lavian and Price-Kennedy—to the extent that these opinions covered the relevant 2001–2008 period at all—"inconsistent with the overall

evidence of record," the ALJ also relied on factors such as Freund's longer-term projects, the treating physicians' lack of a relationship with Freund until years after the time period at issue, and the absence of any contemporaneous indications of pronounced debility in Freund's medical records. (R. 853–54.) The Court cannot conclude that the ALJ committed legal error in his analysis.

Finally, Freund suggests that the ALJ misconstrued the evidence in concluding that Freund rode horses or took an active role in the construction of her family's new house. (Dkt. No. 12 at 24–25.) But the ALJ considered record evidence suggesting that Freund was engaged in horseback riding (R. 296, 302, 305), along with Freund's denial that she rode horses (R. 916–17), and reasonably concluded that Freund "was able [to] engage in . . . therapeutic hobbies such as horse riding" (R. 852; *see also* R. 857). And although the ALJ referenced Freund's ability to "engage in projects such as . . . building a house" as relevant to her residual functional capacity (R. 853), the ALJ permissibly determined that overseeing such a project—which, in Freund's words, was "a very difficult undertaking" (R. 916)—required a level of mental acuity that was probative of Freund's abilities, notwithstanding the involvement of a general contractor who, according to Freund, "coordinated everything" (*id.*).

Ultimately, then, the Court concludes that the ALJ's treatment of the evidence of Freund's activities during the 2001–2008 period at issue did not constitute legal error.

**IV.     Conclusion**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is

GRANTED and Freund's motion for judgment on the pleadings is DENIED.

The Clerk of Court is directed to close the motions at Docket Numbers 11 and 19 and to

close this case.

SO ORDERED.

Dated: March 25, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge